**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

  v.

RICARDO IVAN PALOS-MARQUEZ,
   *Defendant-Appellant.*

No. 08-50498

D.C. No.
3:08-cr-00547-JM-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
November 4, 2009—Pasadena, California

Filed January 19, 2010

Before: Mary M. Schroeder, Marsha S. Berzon, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

**COUNSEL**

Erick L. Guzman, Federal Defenders of San Diego, Inc., San Diego, California, counsel for the appellant.

David L. Katz, Office of the United States Attorney, San Diego, California, counsel for the appellee.

---

**OPINION**

IKUTA, Circuit Judge:

We must decide whether an in-person tip by an unidentified informant provided reasonable suspicion to support border patrol agents' investigatory stop of a vehicle. We hold that such a tip can have significant indicia of reliability, and in light of the totality of the circumstances, there was reasonable suspicion to justify the stop at issue. Therefore, we affirm the judgment of the district court.

I

The investigatory stop at issue occurred on Otay Lakes Road, which is an east-west road five miles north of the United States/Mexican border in an area described as notorious for alien smuggling. As United States Border Patrol Agent Staunton drove around a sharp bend in the road, he saw a dark-colored Dodge Ram pickup truck traveling west in his eastbound lane. The pickup was attempting to pass a westbound UPS truck. Staunton veered to avoid a collision with the pickup, which passed him and continued west. Staunton testified the pickup was traveling "faster than normal" given the conditions of the road.

When a UPS truck passed Staunton, its driver gestured to get Staunton's attention regarding the pickup. Staunton testi-

fied that his knowledge of the area's connection with alien smuggling and the atypically fast speed at which the pickup was traveling, coupled with the UPS driver's gesture, caused him to suspect that the pickup might be loaded with contraband. He radioed to Border Patrol intern[1] agents Simon and Martinez, who were situated farther west on the same road, to be on the lookout for the pickup that was "driving erratically [and] that almost ran [him] off the road." Within seconds, Simon radioed to Staunton that he had a visual of the truck. One minute later, the UPS driver pulled over at Simon's location and reported that he had seen the pickup load up with several suspected illegal aliens. Simon immediately radioed back to Staunton, informing him of the UPS driver's report. Simon did not obtain the UPS driver's name or license plate number.

Staunton then put a call out over the radio to agents in the area, describing the make and model of the pickup and the UPS driver's report. Within minutes of the broadcast, Agent Padron saw the pickup traveling west on Otay Lakes Road at a high rate of speed, as described by the report. When the pickup stopped at the traffic light, an unmarked car of plainclothes Border Patrol agents ("BIC" agents) was able to pull alongside it, and reported that its occupants looked "nervous and shaky." Approximately five minutes after Padron had first seen the pickup, he and the other agents initiated a stop. They found four illegal aliens in the pickup that Palos-Marquez was driving.

Palos-Marquez was charged in a five-count indictment with transportation of illegal aliens and aiding and abetting the commission of that crime in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). Palos-Marquez moved to suppress the fact that illegal aliens were found in the pickup by

---

[1]Agent Staunton testified that Border Patrol interns are agents still in their probationary period, whom the senior agents watch over until they pass their ten-month exam.

arguing that the agents lacked reasonable suspicion to initiate the stop. After an evidentiary hearing, the district court stated that "in the words of Agent Staunton" the area was notorious for alien smuggling and in close proximity to the border. According to the district court, those facts, combined with the pickup's near accident with Staunton and the UPS driver's gesturing, put Staunton on notice that Palos-Marquez "could be a load driver." Taking into account Staunton's initial suspicions, coupled with the UPS driver's "highly reliable" report to Border Patrol agents that he had seen the pickup driver "taking on a load of individuals by the side of the road," the district court held there was "more than reasonable suspicion" to justify the stop, and denied the motion to suppress.

Pursuant to a plea agreement, Palos-Marquez pled guilty to one count of the indictment, reserving the right to appeal the district court's ruling that there was reasonable suspicion for agents to conduct the stop of his vehicle. Judgment was entered and this timely appeal followed.

## II

We review de novo whether there is reasonable suspicion to justify a stop, *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002), and the district court's denial of a motion to suppress, *United States v. Bautista*, 362 F.3d 584, 588-89 (9th Cir. 2004). The district court's underlying factual findings are reviewed for clear error. *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004).

## III

An investigatory stop does not violate the Fourth Amendment "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). To determine whether a stop was supported by reasonable suspicion, "we consider

whether, in light of the totality of the circumstances, the officer had a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

A

**[1]** An officer may justify an investigatory stop based solely or substantially on an informant's tip, depending on its reliability. At its most reliable, an informant's tip alone may sufficiently establish reasonable suspicion for a stop. Thus, in *Adams v. Williams*, the Supreme Court held that where an informant who had provided information in the past and was known to the officer made an in-person tip "that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist," 407 U.S. 143, 145 (1972), the tip "carried enough indicia of reliability to justify the officer's forcible stop" of the defendant, *id.* at 147. At the other end of the reliability spectrum, the Court in *Florida v. J.L.* held that a tip from an anonymous caller telephoning from an unknown location, who reported only that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," lacked any indicia of reliability and could not provide reasonable suspicion for an investigatory stop. 529 U.S. 266, 268-69 (2000).

**[2]** When the tip is provided in a face-to-face encounter, even when the informant is unidentified, we have deemed it to be closer to the *Adams* end of this reliability spectrum. *See United States v. Sierra-Hernandez*, 581 F.2d 760, 763 (9th Cir. 1978). In *Sierra-Hernandez*, a Border Patrol agent was approached by a man wearing overalls, a baseball cap, and driving a late-model Mercedes Benz. *Id.* at 762. The man pointed to a nearby pickup truck and said, "[t]he black pickup truck just loaded with weed at the canebreak." *Id.* The agent, without asking the man for his name or other identifying information, stopped the truck and discovered marijuana. *Id.*

We held the in-person tip was sufficiently reliable to justify the stop. *Id.* at 763-64. We reasoned that by "presenting himself to the agent and doing so while driving a car from which his identity might easily be traced, the informant was in a position to be held accountable for his intervention," and the "reliability of the information was thus increased." *Id.* at 763.

**[3]** Courts have indicated that the in-person nature of a tip gives it substantial indicia of reliability for two reasons. First, as explained above, an in-person informant risks losing anonymity and being held accountable for a false tip. *See id.*; *see also United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004)*; United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000); *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991). Second, when a tip is made in-person, an officer can observe the informant's demeanor and determine whether the informant seems credible enough to justify immediate police action without further questioning. *See*, *e.g.*, *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004); *United States v. Thompson*, 234 F.3d 725, 729 (D.C. Cir. 2000); *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000); *United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994).

**[4]** Here, the UPS driver's tip featured both of these key indicia of reliability. The driver risked losing his anonymity by speaking face-to-face with Agent Simon, who was able to observe his appearance and affiliation with UPS, and who could have asked the driver for identification had it seemed necessary. Moreover, Simon could judge the UPS driver's demeanor and evaluate his credibility.

Other indicia present in this case are also relevant to determining the tip's reliability. For example, if the unidentified informant is a member of a small class of likely sources, we have held that the "tip does provide the lawful basis for some police action." *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (internal quotation marks omitted). In *United States v. Fernandez-Castillo*, a Montana Department

of Transportation (MDOT) employee radioed his dispatcher "about an older model black Monte Carlo . . . whose driver was 'evidently driving quite erratically.' " 324 F.3d 1114, 1116 (9th Cir. 2003). The MDOT dispatcher then told the highway patrol dispatcher that "one of our guys" called in with the tip about the Monte Carlo. *Id.* A highway patrol officer subsequently stopped the vehicle and discovered over 500 grams of methamphetamine. *Id.* at 1116-17. We held that the tip was reliable because the informant "could be held accountable for fabricating any story" if the officer decided to follow up and identify him, which was possible given the officer's knowledge of the informant's place of employment. *Id.* at 1118. Therefore, "the concerns raised by anonymous tips" that "the tipster cannot be held accountable for fabrications and the tipster's reputation cannot be assessed" were "simply not present" in this context. *Id.*

**[5]** In this case, like in *Fernandez-Castillo*, the Border Patrol agent knew that the informant was a UPS driver who had worked a designated route at a certain time on the day of Palos-Marquez's stop. The agent could have reasonably concluded that the UPS driver's identity could be determined with only a small amount of investigation. This increases the reliability of the tip because the informant likely could be held accountable if the information proved to be false.

Palos-Marquez argues that *Sierra-Hernandez* and *Fernandez-Castillo* are distinguishable because the UPS driver did not put his anonymity at risk to the same extent as the informants in those cases. Palos-Marquez asserts that the Si*erra-Hernandez* tipster had a "remarkable appearance" in that he was wearing overalls and a hat, and was driving an atypical car. In addition, Palos-Marquez claims that unlike the tipster in *Fernandez-Castillo*, who was one of a very small number of MDOT employees, the only information the agent knew about the UPS driver was that he "works for a company with 355,000 employees."

We disagree. *Sierra-Hernandez* never described the tipster's appearance as "remarkable" nor considered whether the tipster could easily be found for follow-up questioning. *See* 581 F.2d at 763 ("Here, since the informant was not known to the officer and *cannot be traced*, the officer's testimony cannot be corroborated." (emphasis added)). We held that the tip at issue in *Sierra-Hernandez* was reliable because the in-person informant risked his anonymity, not because officers were able to later track down the informant. *See id.*[2] Nor is *Fernandez-Castillo* distinguishable. Rather, the UPS driver is like the informant in *Fernandez-Castillo* whose association with an employer known to the agent indicated that his identity "could easily be ascertained by a simple inquiry" and the informant could be held accountable for providing a false tip. 324 F.3d at 1118.

There are several other facts present here that weigh in favor of the tip's reliability. The UPS driver relayed his tip near to where he had observed the events, and agents stopped a pickup fitting the driver's description within minutes of his statement. We have held that if an unidentified informant's tip is "made contemporaneously with a complainant's observations" the report is generally more reliable than those made later in time. *Id.* at 1119. Furthermore, the UPS driver indicated that he had first-hand knowledge of the crime when he reported to Agent Simon that he had seen several suspected illegal aliens load into the pickup. Thus, our observation that an informant's tip "is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information"—applies. *United States v. Rowland*, 464 F.3d 899, 908 (9th Cir. 2006) (citation omitted).

---

[2]In any event, the argument that locating a UPS driver who was driving a specific route at a certain time on a given day would be more difficult than finding a man in overalls and a hat who drives a Mercedes Benz runs contrary to common sense.

**[6]** In sum, the UPS driver's tip displayed significant indicia of reliability that supported the agents' formulation of "a reasonable suspicion that criminal activity was occurring," *Sierra-Hernandez*, 581 F.2d at 762, particularly "in the light of the surrounding circumstances" discussed below, *id.* at 764.

B

In addition to the in-person tip, we consider other facts available to the officers to determine whether "in light of the totality of the circumstances, the officer had a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *Berber-Tinoco*, 510 F.3d at 1087 (quoting *Cortez*, 449 U.S. at 417-18). In the context of border patrol stops, relevant facts include: "(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including 'obvious attempts to evade officers'; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience." *United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)).

**[7]** Here, the agents relied on three facts in addition to the in-person tip to support their reasonable suspicion. First, Agent Staunton testified that the Otay Lakes Road area is "notorious not only for alien traffic to cross there through this area, but also load vehicles—people to load up with illegal aliens." Second, the pickup was being driven erratically, at a high rate of speed. Third, the BIC agents observed that the pickup's occupants appeared "nervous and shaky."

Palos-Marquez argues that each of these factors is insufficient to create reasonable suspicion. According to Palos-Marquez, the notoriety of a road as a smuggling corridor generally cannot be a relevant factor in determining whether rea-

sonable suspicion exists because "nearly every road in the Southern District of California is 'notorious' for smuggling," and roads such as Otay Lakes also carry legitimate traffic. This argument must fail; the notoriety of a road as an alien smuggling route has long been held by numerous courts, including the Supreme Court, as a relevant factor supporting reasonable suspicion. *See, e.g.*, *Brignoni-Ponce*, 422 U.S. at 884-85 (listing "the characteristics of the area" and "previous experience with alien traffic" on the road as factors to consider in deciding whether there is reasonable suspicion to stop a car); *Berber-Tinoco*, 510 F.3d at 1088 (finding Lyons Valley Road "notorious" for smuggling); *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 & n.2 (9th Cir. 2002) (finding that Tierra del Sol Road was a "high-crime area," which suggested smuggling).

Palos-Marquez next argues that driving too fast for the road conditions does not support a reasonable suspicion of alien smuggling. We agree that Palos-Marquez's traffic infractions alone do not create a reasonable suspicion of transporting aliens. *See Fernandez-Castillo*, 324 F.3d at 1120 ("It is perfectly understandable that swerving within one's own lane of traffic would not support reasonable suspicion of smuggling, which has nothing to do with impairment," but would support reasonable suspicion that the driver was impaired.). But here Agent Staunton stated that based on his experience, the pickup's erratic driving on Otay Lakes Road, along with the UPS driver's gesture, caused him to suspect that the pickup was smuggling contraband. As we stated in *Berber-Tinoco*, we must give due credence to officers who "may make reasonable deductions and inferences based on their experience and specialized training that might well elude an untrained person." *Berber-Tinoco*, 510 F.3d at 1087 (quotation marks omitted).

Finally, Palos-Marquez argues that the BIC agents' observation that the pickup's occupants appeared "nervous and shaky," occurred after he had been seized, and therefore can-

not be included in the reasonable suspicion analysis. This is incorrect, as the record indicates that the BIC agents' observations were made prior to Palos-Marquez's stop. Accordingly, these observations provide another relevant consideration in the reasonable suspicion equation. *See Arvizu*, 534 U.S. at 276 (holding that passenger conduct can be a factor supporting reasonable suspicion); *Brignoni-Ponce*, 422 U.S. at 885 (stating that "the driver's behavior may be relevant . . . [to] support a reasonable suspicion" that crime is afoot).

**[8]** We therefore reject Palos-Marquez's attempt to discredit individually each of the facts used by agents to determine if there was reasonable suspicion to initiate the stop. *Arvizu* specifically "prohibits courts from adopting a 'divide-and-conquer analysis' by looking at each factor in isolation and according it no weight if it is susceptible to an innocent explanation." *Berber-Tinoco*, 510 F.3d at 1088 (quoting *Arvizu*, 534 U.S. at 274). Instead, we must take a holistic approach, and consider the totality of the circumstances, taking into account all of the facts in light of the others. *See Arvizu*, 534 U.S. at 274. Under this test, even if the UPS driver's in-person tip was not sufficient in itself to give the officers reasonable suspicion, the tip along with the agents' knowledge that the area is notorious for alien smuggling, that the pickup was being driven at a high rate of speed, and that the vehicle's occupants were visibly nervous, was enough to support the investigatory stop.

IV

**[9]** Today we reaffirm our holding in *Sierra-Hernandez* that "[i]nformation from a citizen who confronts an officer in person to advise that a designated individual . . . is committing a specific crime" displays significant indicia of reliability. 581 F.2d at 763. Because the UPS driver's in-person tip had such indicia of reliability, and in light of the notoriety of the area for alien smuggling, the pickup's high rate of speed, and the pickup occupants' nervous demeanor, there was more

than enough evidence to "paint a picture that would create in the mind of a trained border patrol agent a reasonable suspicion that the [vehicle's occupants were] engaged in criminal activity." *United States v. Guzman-Padilla*, 573 F.3d 865, 882 (9th Cir. 2009) (quotation and citation omitted). Therefore, the officers' investigatory stop of the vehicle driven by Palos-Marquez did not violate the Fourth Amendment.

A**FFIRMED**.