**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

MARCEL DARON KING,
            *Defendant-Appellant.*

No. 11-10182

D.C. No.
3:10-cr-00455-
WHA-1

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted
February 13, 2012—San Francisco, California

Filed March 13, 2012

Before: Susan P. Graber, Marsha S. Berzon, and
Richard C. Tallman, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Graber;
Concurrence by Judge Tallman

2937

## COUNSEL

Daniel P. Blank, Assistant Federal Public Defender, San Francisco, California, for the defendant-appellant.

Suzanne B. Miles, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

## OPINION

PER CURIAM:

Defendant Marcel Daron King appeals his conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He challenges the district court's denial of his motion to suppress evidence obtained during a warrantless

probation search of his room.[1] We review de novo a district court's denial of a motion to suppress. *United States v. Mayer*, 560 F.3d 948, 956 (9th Cir. 2009). Underlying findings of fact are reviewed for clear error. *Id.* We affirm.

On May 10, 2010, San Francisco Police Department ("SFPD") officers reported to the scene of a homicide. The victim, Shawnte Sparks, had been shot and killed early that morning. While at the scene, SFPD Officer Joseph Engler noticed an individual ("CW1") watching the police activity. Officer Engler approached CW1, whom he had never met and who previously had not been an informant for the SFPD, and introduced himself.

Initially, CW1 appeared upset and expressed hesitation about speaking with the police. Nevertheless, CW1 spoke at length with Officer Engler. CW1 did not witness the shooting. Shortly after the shooting, however, CW1 began receiving phone calls from various individuals informing him that the victim had been shot and relaying news about how it had happened and who had done it. CW1 told Officer Engler what other people had been saying about the shooting. In particular, CW1 had spoken over the phone with an individual referred to by the parties as "Moniker." Moniker did not see the shooting (although he/she was present at the scene of the crime), but had apparently spoken with an eyewitness, "CW2." Officer Engler was familiar with Moniker and CW2, although neither had served as an informant for the SFPD.

CW1 told Officer Engler some of what Moniker had relayed about what CW2 had said to Moniker about the identity of the shooter. More details emerged when Officer Engler listened (unbeknownst to Moniker) to a phone call between Moniker and CW1. While still standing near the scene of the

---

[1]In his appeal, Defendant also argues that his confession was inadmissible and that his sentence was unreasonable. We resolve those issues by memorandum disposition filed this date.

crime with Officer Engler, CW1 used his/her cell phone to call Moniker. CW1 put the phone in "speaker" mode so that Officer Engler could hear the conversation, but did not tell Moniker that a police officer was listening. During that conversation, Moniker said that CW2 had described the shooter as a heavyset African-American man with dreadlocks and referred to him as "Marcel" from the cover of the "Bread Me Out Family" rap album.

After the phone call ended, CW1 explained that he/she was familiar with Marcel from around the neighborhood. CW1 also told Officer Engler that Marcel had been involved in an altercation with the victim some weeks earlier at Marcel's son's school. The dispute was over whether the victim's child had accidentally taken Marcel's son's coat. It is unclear from the record whether CW1 had witnessed the altercation or had simply heard about it.

CW1 also told Officer Engler that, although he/she did not know Marcel's last name, he/she did know where Marcel lived, but could not remember the exact address. So, CW1 got into Officer Engler's unmarked police car and directed him to Marcel's house, which turned out to be located at 1526 Hudson Street.

After noting the location that CW1 had shown him, Officer Engler returned to the police station. Using Google, Officer Engler searched online for "Bread Me Out" and retrieved an album cover depicting African-American men. At this point, Officer Engler called CW1 and asked him/her to go to the same website that Officer Engler had pulled up on the screen. CW1 did so. Officer Engler asked whether the person, Marcel, who lived at 1526 Hudson Street, appeared on the album cover. CW1 identified Marcel.

After CW1 identified Marcel from the album cover, Officer Engler and his partner searched the police database for anything associated with 1526 Hudson Street and the name "Mar-

cel." Their search produced the name "Marcel King." They then compared a mug shot of Marcel King with the "Bread Me Out Family" album cover photograph of the individual identified by CW1 as Marcel. The officers noted that the two photographs appeared to depict the same individual. That individual is the defendant in this case.

At that point, Officer Engler and his partner checked Defendant's criminal history. They discovered that Defendant was on adult felony probation in the City and County of San Francisco. They also found that Defendant's probation included a warrantless search condition, which stated: "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole or probation officer." The residence listed with the probation office was 1526 Hudson Street.

Officer Engler and several other officers went to 1526 Hudson Street and searched that house. The house was occupied by Defendant's grandmother, Odessa Allen. She told the officers that Defendant actually stayed at his mother's house, which was located at 78 Edgar Place.

The officers then went to 78 Edgar Place. There, they met Defendant's mother, Veronica Bradford. The parties dispute whether Ms. Bradford consented to the officers' search of her home and of Defendant's room in particular. Regardless, the officers did indeed search the home, including the room that Ms. Bradford pointed out as belonging to Defendant. Under the bed in Defendant's room, the officers found an unloaded shotgun. That shotgun formed the basis for Defendant's conviction under 18 U.S.C. § 922(g)(1).

Defendant argues that the shotgun should have been suppressed because police lacked reasonable suspicion to search his room.[2] In particular, Defendant asserts that the only infor-

---

[2]The parties do not dispute that police had probable cause to believe that Defendant was residing at his mother's home at 78 Edgar Place. *See*

mation linking him to the homicide was obtained from sources not shown to be reliable.

Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). We have explained:

> While the probable cause requirement for a warrant requires a fair probability that contraband or evidence of a crime will be found, reasonable suspicion is less demanding and can arise from information that is less reliable than that required to show probable cause. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the totality of the circumstances. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (internal quotation marks, citations, and ellipsis omitted).

Information obtained from an informant can provide reasonable suspicion for a search. *Id.* "When a court is considering whether an informant's tip is sufficient to support a finding of probable cause or reasonable suspicion, the court must employ a 'totality-of-the-circumstances approach' that

*United States v. Franklin*, 603 F.3d 652, 656 (9th Cir. 2010) (holding that, before conducting a warrantless search pursuant to a probation condition, law enforcement officers must have probable cause to believe that the probationer is a resident of the house to be searched).

takes into consideration the informant's 'veracity' or 'reliability' and his 'basis of knowledge.' " *Id.* We look to a variety of factors to assess the reliability of an informant's tip, including (1) whether the tip was anonymous; (2) whether the informant had a proven track record of reliability; (3) whether the informant revealed his/her basis of knowledge; and (4) whether the informant provided detailed, predictive information that was later corroborated by police observation. *Id.* at 907-08.

Here, CW1 lacked most of the indicia of a reliable informant. CW1 and Officer Engler did meet face-to-face. *See United States v. Palos-Marquez*, 591 F.3d 1272, 1276 (9th Cir.) (noting that in-person tips are generally more reliable because the informant can be held accountable for making a false tip and police have the opportunity to observe the informant's demeanor), *cert. denied*, 131 S. Ct. 339 (2010). But CW1 had no track record of reliability, having never before served as an informant for the SFPD. Furthermore, although CW1 did reveal his/her basis of knowledge, that basis of knowledge was double hearsay. *Cf. United States v. Villasenor*, 608 F.3d 467, 474 (9th Cir.) (finding the informant reliable in part because he had "first-hand knowledge" of the criminal activities of the defendant (internal quotation marks omitted)), *cert. denied*, 131 S. Ct. 547 (2010); *Palos-Marquez*, 591 F.3d at 1277 (suggesting that what is important is not just whether an informant reveals his/her basis of knowledge, but also whether or not that basis of knowledge is firsthand); *United States v. Patayan Soriano*, 361 F.3d 494, 507 (9th Cir. 2004) (stating that an informant's "detailed, first-hand observations satisfy the basis of knowledge component" for finding probable cause upon which to issue a warrant); *United States v. Bishop*, 264 F.3d 919, 925 (9th Cir. 2001) (noting that the basis of knowledge requirement was met by an informant's information, which "was not based on hearsay, but came from first-hand knowledge"). Police may rely on hearsay reported by informants, but such information is reliable only if there is reason to believe that the hearsay is

truthful. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) ("Hearsay reported by informants is no bar to a finding of probable cause. When the circumstances suggest veracity, such as an admission against penal interest, a statement made to an informant may be considered reliable."). Here, no such circumstances exist. Finally, CW1 also provided no predictive information about Defendant's future activities.

An important additional factor weighs against CW1's reliability as an informant. The police were aware that CW1 had a motive to implicate Defendant falsely because of friction between their families. *Cf. Rowland*, 464 F.3d at 908 (noting that the fact that "the informant did not have any apparent motive to fabricate the tip" suggested reliability). This fact further undermines CW1's credibility. Thus, considering the totality of the circumstances, we conclude that CW1 was an unreliable informant.

Officer Engler also heard directly from Moniker by listening, unbeknownst to Moniker, to a telephone conversation between Moniker and CW1. But, like CW1, Moniker had no track record of reliability, lacked firsthand information, and provided no predictive information about Defendant's future activities. Furthermore, Moniker and Officer Engler did not meet face-to-face. *See Palos-Marquez*, 591 F.3d at 1275 ("Courts have indicated that the in-person nature of a tip gives it substantial indicia of reliability for two reasons. First, . . . an in-person informant risks losing anonymity and being held accountable for a false tip. Second, when a tip is made in-person, an officer can observe the informant's demeanor and determine whether the informant seems credible enough to justify immediate police action without further questioning." (citations omitted)). Here, Officer Engler had no opportunity to observe Moniker's demeanor. Furthermore, Moniker did not know that he/she was speaking to a police officer at the same time as he/she was chatting with CW1. For that reason, Moniker could not have felt pressure to tell the truth in order

to avoid being held criminally accountable for providing a false tip, because Moniker never knew that he/she was providing a tip in the first place. Thus, the information provided by Moniker possessed no greater indicia of reliability than that provided by CW1.

The information provided by CW1 and Moniker linking Defendant to the homicide was therefore highly unreliable. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Rowland*, 464 F.3d at 907 (internal quotation marks omitted). After speaking with CW1, Officer Engler did conduct a further investigation. But Officer Engler's subsequent investigation was devoted entirely to verifying the *identity* of the "Marcel" that CW1 and Moniker had mentioned. In this pursuit, Officer Engler was admirably thorough. But none of the inquiries was relevant to the question whether Defendant was involved in the *homicide*.

In fact, police made *no* effort to corroborate any of the information purportedly linking Defendant to the homicide. They did not track down CW2, the eyewitness, or question him or her. They did not go to Defendant's son's school to find out more about the argument that supposedly had occurred between Defendant and the victim. Before searching Defendant's residence, the police conducted no further investigation whatsoever into his alleged involvement in the homicide.[3]

[1] Thus, we face a situation in which the police conducted a search of Defendant's room solely because of a highly unreliable tip, without having investigated Defendant's alleged involvement in the homicide. The *only* information linking Defendant to the homicide was CW1 and Moniker's unsubstantiated double and triple hearsay. In these circumstances,

---

[3]In fact, Defendant was never charged with the homicide.

police lacked a reasonable suspicion that Defendant was engaged in criminal activity.

**[2]** The conclusion that police lacked reasonable suspicion to search Defendant's room does not, however, end the inquiry as to whether the district court properly denied Defendant's motion to suppress. In *United States v. Baker*, 658 F.3d 1050, 1055-56 (9th Cir. 2011), we held that suspicionless search conditions for probationers do not violate the Fourth Amendment. In *Baker*, the defendant challenged a condition of probation subjecting him to search "with or without probable cause, and with or without reasonable suspicion." *Id.* at 1054 (internal quotation marks omitted). We concluded that "a suspicionless search of a probationer does not violate the Fourth Amendment." *Id.* at 1055-56.

**[3]** Here, Defendant was subject to warrantless search as a condition of his probation: "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole or probation officer." Defendant argues that his probation condition falls outside the scope of *Baker* because it allows searches "with or without probable cause," instead of "with or without reasonable suspicion."

**[4]** We are unconvinced by Defendant's argument. Simply because a search *may* be conducted *without* probable cause does not mean that it *must* be conducted *with* reasonable suspicion. It would be unreasonable to read Defendant's probation condition as implicitly imposing a reasonable suspicion requirement. To the contrary, the plain import of Defendant's probation condition, allowing warrantless searches at any time, is that Defendant may be searched whether or not police suspect him of wrongdoing.

**[5]** Defendant's claim thus falls squarely within the purview of *Baker*. Although the police did not have reasonable

suspicion to search Defendant's room, they needed no such suspicion, because Defendant was subject to suspicionless search as a condition of his probation. Under *Baker*, such searches do not violate the Fourth Amendment. Accordingly, the district court properly denied Defendant's motion to suppress.

**AFFIRMED.**

---

GRABER, Circuit Judge, with whom BERZON, Circuit Judge, joins, concurring:

I concur fully in the per curiam opinion. But, for the reasons expressed in the concurrence in *United States v. Baker*, 658 F.3d 1050, 1058-60 (9th Cir. 2011) (Graber, J., concurring), I again urge the court to reconsider this issue en banc so as to take account of developments in Supreme Court law.

---

TALLMAN, Circuit Judge, concurring in the judgment:

I concur in the judgment that the district court properly denied King's motion to suppress. I write separately because I disagree with my colleagues' conclusion that Inspector Engler lacked reasonable suspicion to connect King to the homicide. Testimony adduced at the evidentiary hearing sufficiently corroborated his possible motive and opportunity, as well as explained how the detectives confirmed a detailed identification of King as the shooter provided by informants. Because an officer's reasonable suspicion of criminal activity is constitutionally sufficient to search the home of a probationer who is subject to a search condition, both *United States v. Knights*, 534 U.S. 112, 121 (2001), and *United States v. Baker*, 658 F.3d 1050 (9th Cir. 2011), authorize the officers'

actions. The district court correctly held that Inspector Engler had reasonable suspicion of criminal activity.

Courts must consider the totality of the circumstances in determining whether an officer had reasonable suspicion. *See United States v. Cortez*, 449 U.S. 411, 417 (1981). It is true that no homicide charges were ever brought against King. That could be due to a host of reasons the record does not reveal: an inability to obtain sufficient admissible evidence to meet the prosecution's burden to prove guilt beyond a reasonable doubt; witnesses unwilling to testify for fear of retaliation; etc. But we must remember that this "process does not deal with hard certainties, but with probabilities" and the evidence "collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 418; *Adams v. Williams*, 407 U.S. 143, 149 (1972) ("In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (internal quotation marks omitted)).

The majority asks too much of the informant, CW1, and inappropriately second-guesses the training, experience, and good police work of a nineteen-year-veteran homicide detective. Inspector Engler followed leads that strongly suggested that Marcel King might be the shooter who was still at large in the early morning hours of May 10, 2010. CW1 was a citizen informant who professed to know the victim of the murder, Marcel's first name, and the nearby home where King had lived. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) (holding that citizen informants require less evidence to prove their reliability than criminal informants). As the majority concedes, CW1 met Inspector Engler in person at the scene of the crime while the investigators were processing the scene for evidence. *See Adams*, 407 U.S. at 146-47 (suggesting that informants who meet personally

with officers are more reliable). A thirty-minute conversation revealed the basis of his/her knowledge, further enhancing CW1's reliability. *See United States v. Rowland*, 464 F.3d 899, 907-08 (9th Cir. 2006) (holding that an informant's disclosure of the source of their information increases reliability). CW1 was not suspected of having engaged in any criminal activity, so a reasonable officer could assess and evaluate the information supplied from this citizen informant before acting upon it. *See Adams*, 407 U.S. at 146-47.

There were additional reasons to trust the informant. Although it is not clear exactly how much time transpired between the shooting and CW1 and Inspector Engler's on-scene conversation, CW1 relayed the tip shortly afterwards while officers were still investigating what had occurred there. *See United States v. Palos-Marquez*, 591 F.3d 1272, 1277 (9th Cir. 2010) (holding that contemporaneous tips are more reliable). The description of the shooter—as an overweight, black male with dreadlocks who looked like the "Marcel" appearing in the picture of a local rap group on its "Bread Me Out Family" album cover—and of the shooting itself, contained "sufficient detail to dispel concerns that the tip was a hoax." *Rowland*, 464 F.3d at 908. And it was of the sort that prudent follow-up investigation could confirm or dispel fairly quickly.

The tip met other common-sense "indicia of reliability." *See Palos-Marquez*, 591 F.3d at 1277. It was Inspector Engler who approached CW1, not the other way around, and CW1 was not initially eager to divulge any information, expressing a fear of retaliation since CW1 knew King's family to have a bad reputation on the street. It is true, as the majority notes, that the friction between King's and CW1's families could potentially tempt CW1 to implicate King. *See Rowland*, 464 F.3d at 908. But CW1 would have known this fact tended to cast doubt on his/her credibility, yet he/she forthrightly admitted it to the detective. In addition, CW1 was visibly distraught at the death of a family member and presumably cared more

about apprehending the real killer than satisfying some unrelated vendetta.

The inspector had additional reason to suspect King's involvement in the shooting before the search of 78 Edgar Place. Based on his experience working the streets in the Bayview-Hunters Point neighborhood and personal knowledge of its occupants, Inspector Engler conducted further investigation to see if the informant's tip might be fruitful in identifying and apprehending the killer. CW1 voluntarily accompanied the detective to a house on Hudson Street and pointed out where "Marcel" lived. The house was a short distance from the scene of the crime. The majority concedes that CW1 supplied evidence of a possible motive when he/she informed Inspector Engler of the recent verbal altercation between the victim and King regarding the theft of a coat belonging to King's child from a school where the children of both men attended—a story that King himself later corroborated. King's grandmother told police that, at some point on the night of the shooting, King had visited but not stayed at the Hudson Street house. The police also knew that King had a recent felony conviction, *see United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995) (holding that prior felony convictions are relevant to probable cause), in this case for another violent crime—felony assault on his domestic partner, the mother of the child whose coat was missing. *Cf. Rowland*, 464 F.3d at 908 (holding that a suspect's background of similar criminal activity is relevant to reasonable suspicion).

Three of the most important factors in assessing a tip for reasonable suspicion are the informant's "veracity, reliability, and basis of knowledge." *See Alabama v. White*, 496 U.S. 325, 328-29 (1990) (internal quotation marks omitted). As shown above, CW1 revealed the source of his/her knowledge and gave Inspector Engler ample reason to believe him/her. The only factor that arguably disfavors holding that there was reasonable suspicion is CW1's untested reliability. The information provided by CW1—and Moniker during the phone

call with CW1 overheard by Inspector Engler—surely was hearsay. *But see United States v. Woods*, 720 F.2d 1022, 1029 (9th Cir. 1983) ("There is no requirement . . . that the informer be a percipient witness to the reported facts."). But Inspector Engler also had reason to know of Moniker's and CW2's credibility, having interacted with both of them in the past (including a prior arrest by Inspector Engler of CW2's brother) and having actually interviewed Moniker on a previous occasion. Facts built upon facts pointed the arrow of reasonable suspicion to King's involvement in the murder. "[T]he subtleties of the hearsay rule should not thwart an appropriate police response." *Adams*, 407 U.S. at 147.

The flaw in the per curiam opinion is that it treats the assessment of these facts as if looking to establish probable cause to tie King to the murder. But reasonable suspicion is considerably laxer than probable cause. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). "Although the totality of the circumstances in this case might not be enough to establish probable cause, here we deal instead with the less demanding reasonable suspicion standard." *Rowland*, 464 F.3d at 908. Through dogged police work, Inspector Engler quickly dug up sufficient corroborating evidence that identified Marcel King, his known abodes, his criminal history involving other violent crimes, his current probationary status, and a possible motive to kill the victim. Under the totality of the circumstances, it was certainly proper to focus the next step of the investigation into looking for King where he might be living. At this point, King was surely the focus of the police homicide investigation and the best suspect Inspector Engler had.

The majority second-guesses Inspector Engler for not interviewing Moniker and CW2 before conducting his search, but the killer was at large and the detective already had credible, incriminating evidence of a suspect's motive, opportunity and identity. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for

probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams*, 407 U.S. at 145. Inspector Engler painstakingly identified Marcel King as a suspect. He located a picture online of King's "Bread Me Out Family" album cover and had CW1 corroborate that it was the same Marcel that Moniker had described. Inspector Engler and his partner then ran a search on a police database recording prior law enforcement activity at 1526 Hudson Street—the location identified by CW1 as Marcel's home—with "Marcel" and the results linked the address to Marcel King. They confirmed that King's picture matched the picture of Marcel on the album cover and that King was on probation subject to a search condition. Pondering whether the officers could have then strengthened their legal case by interviewing Moniker and CW2 is beside the point; they had a strong lead and knew with the search condition that they needed only reasonable suspicion to proceed.

Once further investigation established probable cause to conclude that King was using a bedroom at the home of his mother on Edgar Place, a conclusion neither party disputes, I would hold under the totality of the circumstances test that Inspector Engler had reasonable suspicion to conduct a probation search of King's residence for evidence of his involvement in the murder and affirm under *Knights*. We thus need not reach the open question identified in *Baker* as to whether a search without reasonable suspicion would still satisfy the Fourth Amendment. *See Baker*, 658 F.3d at 1058-60 (Graber, J., concurring). And because I agree with my colleagues that the district court properly denied King's motion to suppress, I concur in the judgment on these independent grounds.