TALLMAN, Circuit Judge,
concurring in the judgment:
I concur in the judgment that the district court properly denied King’s motion to suppress. I write separately because I disagree with my colleagues’ conclusion that Inspector Engler lacked reasonable suspicion to connect King to the homicide. Testimony adduced at the evidentiary hearing sufficiently corroborated his possible motive and opportunity, as well as explained how the detectives confirmed a detailed identification of King as the shooter provided by informants. Because an officer’s reasonable suspicion of criminal activity is constitutionally sufficient to search the home of a probationer who is subject to a search condition, both United *1140 States v. Knights, 534 U.S. 112, 121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), and United States v. Baker, 658 F.3d 1050 (9th Cir.2011), authorize the officers’ actions. The district court correctly held that Inspector Engler had reasonable suspicion of criminal activity.
Courts must consider the totality of the circumstances in determining whether an officer had reasonable suspicion. See United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It is true that no homicide charges were ever brought against King. That could be due to a host of reasons the record does not reveal: an inability to obtain sufficient admissible evidence to meet the prosecution’s burden to prove guilt beyond a reasonable doubt; witnesses unwilling to testify for fear of retaliation; etc. But we must remember that this “process does not deal with hard certainties, but with probabilities” and the evidence “collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.” Id. at 418, 101 S.Ct. 690; Adams v. Williams, 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (“In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.” (internal quotation marks omitted)).
The majority asks too much of the informant, CW1, and inappropriately second-guesses the training, experience, and good police work of a nineteen-year-veteran homicide detective. Inspector Engler followed leads that strongly suggested that Marcel King might be the shooter who was still at large in the early morning hours of May 10, 2010. CW1 was a citizen informant who professed to know the victim of the murder, Marcel’s first name, and the nearby home where King had lived. See United States v. Angulo-Lopez, 791 F.2d 1394, 1397 (9th Cir.1986) (holding that citizen informants require less evidence to prove their reliability than criminal informants). As the majority concedes, CW1 met Inspector Engler in person at the scene of the crime while the investigators were processing the scene for evidence. See Adams, 407 U.S. at 146-47, 92 S.Ct. 1921 (suggesting that informants who meet personally with officers are more reliable). A thirty-minute conversation revealed the basis of his/her knowledge, further enhancing CWl’s reliability. See United States v. Rowland, 464 F.3d 899, 907-08 (9th Cir. 2006) (holding that an informant’s disclosure of the source of their information increases reliability). CW1 was not suspected of having engaged in any criminal activity, so a reasonable officer could assess and evaluate the information supplied from this citizen informant before acting upon it. See Adams, 407 U.S. at 146-47, 92 S.Ct. 1921.
There were additional reasons to trust the informant. Although it is not clear exactly how much time transpired between the shooting and CW1 and Inspector Engler’s on-scene conversation, CW1 relayed the tip shortly afterwards while officers were still investigating what had occurred there. See United States v. Palos-Marquez, 591 F.3d 1272, 1277 (9th Cir.2010) (holding that contemporaneous tips are more reliable). The description of the shooter — as an over-weight, black male with dreadlocks who looked like the “Marcel” appearing in the picture of a local rap group on its “Bread Me Out Family” album cover — and of the shooting itself, contained “sufficient detail to dispel concerns that the tip was a hoax.” Rowland, 464 F.3d at 908. And it was of the sort that prudent follow-up investigation could confirm or dispel fairly quickly.
*1141 The tip met other common-sense “indicia of reliability.” See Palos-Marquez, 591 F.3d at 1277. It was Inspector Engler who approached CW1, not the other way around, and CW1 was not initially eager to divulge any information, expressing a fear of retaliation since CW1 knew King’s family to have a bad reputation on the street. It is true, as the majority notes, that the friction between King’s and CWl’s families could potentially tempt CW1 to implicate King. See Rowland, 464 F.3d at 908. But CW1 would have known this fact tended to cast doubt on his/her credibility, yet he/she forthrightly admitted it to the detective. In addition, CW1 was visibly distraught at the death of a family member and presumably cared more about apprehending the real killer than satisfying some unrelated vendetta.
The inspector had additional reason to suspect King’s involvement in the shooting before the search of 78 Edgar Place. Based on his experience working the streets in the Bayview-Hunters Point neighborhood and personal knowledge of its occupants, Inspector Engler conducted further investigation to see if the informant’s tip might be fruitful in identifying and apprehending the killer. CW1 voluntarily accompanied the detective to a house on Hudson Street and pointed out where “Marcel” lived. The house was a short distance from the scene of the crime. The majority concedes that CW1 supplied evidence of a possible motive when he/she informed Inspector Engler of the recent verbal altercation between the victim and King regarding the theft of a coat belonging to King’s child from a school where the children of both men attended — a story that King himself later corroborated. King’s grandmother told police that, at some point on the night of the shooting, King had visited but not stayed at the Hudson Street house. The police also knew that King had a recent felony conviction, see United States v. Collins, 61 F.3d 1379, 1384 (9th Cir.1995) (holding that pri- or felony convictions are relevant to probable cause), in this case for another violent crime — felony assault on his domestic partner, the mother of the child whose coat was missing. Cf. Rowland, 464 F.3d at 908 (holding that a suspect’s background of similar criminal activity is relevant to reasonable suspicion).
Three of the most important factors in assessing a tip for reasonable suspicion are the informant’s “veracity, reliability, and basis of knowledge.” See Alabama v. White, 496 U.S. 325, 328-29, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (internal quotation marks omitted). As shown above, CW1 revealed the source of his/her knowledge and gave Inspector Engler ample reason to believe him/her. The only factor that arguably disfavors holding that there was reasonable suspicion is CWl’s untested reliability. The information provided by CW1 — and Moniker during the phone call with CW1 overheard by Inspector Engler — surely was hearsay. But see United States v. Woods, 720 F.2d 1022, 1029 (9th Cir.1983) (“There is no requirement ... that the informer be a percipient witness to the reported facts.”). But Inspector Engler also had reason to know of Moniker’s and CW2’s credibility, having interacted with both of them in the past (including a prior arrest by Inspector Engler of CW2’s brother) and having actually interviewed Moniker on a previous occasion. Facts built upon facts pointed the arrow of reasonable suspicion to King’s involvement in the murder. “[T]he subtleties of the hearsay rule should not thwart an appropriate police response.” Adams, 407 U.S. at 147, 92 S.Ct. 1921.
The flaw in the per curiam opinion is that it treats the assessment of these facts as if looking to establish probable cause to tie King to the murder. But reasonable suspicion is considerably laxer than proba *1142 ble cause. United States v. Arvizu, 534 U.S. 266, 273-74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). “Although the totality of the circumstances in this case might not be enough to establish probable cause, here we deal instead with the less demanding reasonable suspicion standard.” Rowland, 464 F.3d at 908. Through dogged police work, Inspector Engler quickly dug up sufficient corroborating evidence that identified Marcel King, his known abodes, his criminal history involving other violent crimes, his current probationary status, and a possible motive to kill the victim. Under the totality of the circumstances, it was certainly proper to focus the next step of the investigation into looking for King where he might be living. At this point, King was surely the focus of the police homicide investigation and the best suspect Inspector Engler had.
The majority second-guesses Inspector Engler for not interviewing Moniker and CW2 before conducting his search, but the killer was at large and the detective already had credible, incriminating evidence of a suspect’s motive, opportunity and identity. “The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.” Adams, 407 U.S. at 145, 92 S.Ct. 1921. Inspector Engler painstakingly identified Marcel King as a suspect. He located a picture online of King’s “Bread Me Out Family” album cover and had CW1 corroborate that it was the same Marcel that Moniker had described. Inspector Engler and his partner then ran a search on a police database recording prior law enforcement activity at 1526 Hudson Street — -the location identified by CW1 as Marcel’s home — with “Marcel” and the results linked the address to Marcel King. They confirmed that King’s picture matched the picture of Marcel on the album cover and that King was on probation subject to a search condition. Pondering whether the officers could have then strengthened their legal case by interviewing Moniker and CW2 is beside the point; they had a strong lead and knew with the search condition that they needed only reasonable suspicion to proceed.
Once further investigation established probable cause to conclude that King was using a bedroom at the home of his mother on Edgar Place, a conclusion neither party disputes, I would hold under the totality of the circumstances test that Inspector Engler had reasonable suspicion to conduct a probation search of King’s residence for evidence of his involvement in the murder and affirm under Knights. We thus need not reach the open question identified in Baker as to whether a search without reasonable suspicion would still satisfy the Fourth Amendment. See Baker, 658 F.3d at 1058-60 (Graber, J., concurring). And because I agree with my colleagues that the district court properly denied King’s motion to suppress, I concur in the judgment on these independent grounds.