**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

DAVID BERBER-TINOCO,
           *Defendant-Appellant.*

No. 06-50684

D.C. No.
CR-06-00468-RTB

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
September 27, 2007—Pasadena, California

Filed December 19, 2007

Before: J. Clifford Wallace, Thomas G. Nelson, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

16531

**COUNSEL**

James Fife, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

David D. Leshner, Assistant United States Attorney, Office of the United States Attorney, San Diego, California, for the plaintiff-appellee.

**OPINION**

IKUTA, Circuit Judge:

We consider the challenge brought by David Berber-Tinoco to the district court's denial of his motion to suppress. Berber sought to suppress his statements and fingerprints which were taken pursuant to an arrest by Border Patrol officers. Berber argues that the officers lacked reasonable suspicion to stop him, and also argues that we must reverse the district court's ruling due to misconduct by the district court judge during the suppression hearing. We hold that there was reasonable suspicion for the stop and that the judge's violation of Rule 605 of the Federal Rules of Evidence was harmless. Therefore, we affirm.

I

Around 10:30 on the night of February 9, 2006, Border Patrol Officers Thomas Englehorn and Robert Lenoir were positioned in their vehicles at different spots on Lyons Valley Road between Honey Springs and Japatul Valley Road. This area is completely rural with no residences and no businesses other than a juvenile detention center and a fire station. Two hours earlier, a seismic intrusion device had been activated. Based on their experience, the officers knew that it would take an alien crossing the border approximately two hours to get to this site, which was a notorious smuggling area with known load sites for aliens.

From his position at the Japatul Fire Station off of Lyons Valley Road, Officer Engelhorn saw two vehicles, a Dodge Durango and a Ford pickup truck, approach the area. Already on the look-out for smuggling because of the alarm from the seismic intrusion device, Officer Engelhorn became suspicious when he observed the two vehicles driving "right next to each other, not more than a car or two car lengths apart, traveling at a slow rate of speed." The cars repeatedly braked

and then continued at their slow speed until they were out of Officer Engelhorn's view. Officer Engelhorn did not stop the vehicles at that point; he wanted to see if the two vehicles continued westbound in the same direction toward Honey Springs, which would suggest the vehicles were merely local traffic.

After the vehicles left his sight, Officer Engelhorn pulled out and followed the vehicles westbound toward the juvenile detention center. Given the terrain and the officer's attempt to remain undetected, he did not have the cars within his vision the entire time. He then saw the two cars turn around at the detention center and return eastbound. The Durango passed him, and the pickup truck pulled over between a 15-mile marker and the detention center. It then pulled out again and continued east.

According to Officer Engelhorn, the area where the vehicles were turning around was heavily used for loading aliens. He testified that "based on [his] experience, it's almost a nightly occurrence between there and the 15-mile marker and the . . . fire station." Given the alarm from the seismic intrusion device, the timing when the vehicles approached the area, and their conduct which included turning around at known loading spots, the officer believed the vehicles were loading up with illegal aliens as part of a smuggling operation. Relying on this evidence and their suspicions, the officers made an investigatory stop of the two vehicles at that point.

Berber, a passenger in one of the vehicles, was arrested and charged with unlawful re-entry into the United States after deportation in violation of 8 U.S.C. § 1326.[1] Berber filed a

---

[1] 8 U.S.C. § 1326(a) provides:

Subject to subsection (b) of this section, any alien who—

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

motion to suppress evidence of his fingerprints and statements to the officers as the fruits of an allegedly unlawful stop. After an evidentiary hearing, the district court denied the motion to suppress. Berber entered into a conditional guilty plea agreement that allowed him to appeal this ruling.

II

We review de novo whether the officers had reasonable suspicion to make an investigatory stop. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We review the district court's findings of fact for clear error. *Id.*; *United States v. Tiong*, 224 F.3d 1136, 1139 (9th Cir. 2000).

[1] The Fourth Amendment right to be secure from unreasonable searches and seizures by the government "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). A brief investigatory stop does not violate the Fourth Amendment, however, "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

In determining whether a stop was justified by a reasonable suspicion, we consider whether, in light of the totality of the

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

circumstances, the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). For purposes of this analysis, the totality of the circumstances includes "objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of law-breakers." *Id.* at 418. In the context of border patrol stops, the totality of the circumstances may include "(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including 'obvious attempts to evade officers'; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience." *United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997) (quoting *Brignoni-Ponce*, 422 U.S. at 885).

As noted above, in order to uphold the validity of the investigatory stop, we must discern from this melange of factors "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18. Often, the data in the record seems equally capable of supporting an innocent explanation as a reasonable suspicion. In such cases, the Supreme Court directs us to give due weight to the factual inferences drawn by law enforcement officers, *United States v. Arvizu*, 534 U.S. 266, 277 (2002), and has noted that officers may make reasonable deductions and inferences based on their experience and specialized training that "might well elude an untrained person." *Id.* at 273 (internal quotation marks omitted). In this vein, the Court has emphasized that even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion. *Id.* at 274. Of course, officers cannot rely solely on factors that would apply to many law-abiding citizens. *See, e.g.*, *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002) ("Reasonable suspicion may not be based on broad profiles which cast sus-

picion on entire categories of people without any individualized suspicion of the particular person to be stopped.") (internal quotation marks omitted); *United States v. Sigmond-Ballesteros,* 285 F.3d 1117, 1127 (9th Cir. 2002) (holding that there was no reasonable suspicion where the factors underlying the suspicion depicted " 'a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure' ") (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). However, the Supreme Court prohibits courts from adopting a "divide-and-conquer analysis" by looking at each factor in isolation and according it no weight if it is susceptible to an innocent explanation. *Arvizu,* 534 U.S. at 274.

**[2]** A reasonable suspicion of criminal activity may be sufficiently particularized where officers have narrowed the time and place of expected criminal activity through deduction or through a reliable tip. *See, e.g., United States v. Paopao*, 469 F.3d 760, 766-67 (9th Cir. 2006) (holding there was reasonable suspicion for a protective sweep based on a reasonably detailed tip from a reliable informant); *see also Cortez*, 449 U.S. at 419-20. In *Cortez*, border patrol agents deduced solely from their observation of footprints in the desert that groups of aliens, probably led by a guide, were crossing the border and proceeding 30 miles to an isolated point on Highway 86. Based on their experience, the officers further deduced that another crossing was likely to occur on the next clear night, and that a group would likely arrive at the highway between 2 a.m. and 6 a.m. In light of these "permissible deductions," *id.* at 419, the Supreme Court concluded that the officers had a reasonable suspicion to stop a pickup truck with a camper shell (the sort of vehicle the officers expected would be used to carry aliens that night) that passed a crossing point twice. *Id.* at 413-15, 421-22; *see also United States v. Ordaz*, 145 F.3d 1111 (9th Cir. 1998) (holding that the fact that the officers knew that border sensors had been activated, and one officer had seen a bundle put in a vehicle of undetermined

make, was a sufficient basis for reasonable suspicion to stop four vehicles coming out of the observed area).

[3] In this case, based on the totality of the circumstances, we conclude that the officers did have an objective and particularized suspicion that the two vehicles observed on Lyons Valley Road were "engaged in wrongdoing." *Cortez*, 449 U.S. at 418. First, the officers were able to narrow their suspicion through deduction. The officers testified that a seismic intrusion device was activated, which in their experience indicated that someone had just illegally crossed the border. We have long accepted alarms from seismic intrusion devices at the border as an acceptable factor in a reasonable suspicion analysis. *See, e.g.*, *United States v. Olafson*, 213 F.3d 435, 439-40 (9th Cir. 2000); *United States v. Avalos-Ochoa*, 557 F.2d 1299, 1301-02 (9th Cir. 1977). The officers deduced that illegal aliens would likely be picked up at the Lyons Valley Road loading area that was notorious for alien smuggling. Because the site was within a two hour walk from the border, the officers reasonably deduced that vehicles picking up aliens were likely to arrive at the site during that time frame, and therefore staked out the site at that time to watch for suspicious behavior. The ensuing conduct of the vehicles, which arrived at the suspected time at the suspected site, created a particularized set of circumstances and did not raise a concern that officers might on this basis target "[t]housands of United States citizens." *United States v. Salinas*, 940 F.2d 392, 395 (9th Cir. 1991). Indeed, the chain of deductions here was much more direct than the reasoning upheld by the Supreme Court in *Cortez*.

[4] Second, the officers made reasonable factual inferences based on their experience with smuggling activities in the area. The officers testified that at that hour (about 10:30 at night) in that rural, remote area, local traffic would normally travel around 55 miles per hour and continue westbound toward Honey Springs. Therefore, it was reasonable for the officers to conclude that the behavior of the two vehicles at

issue was suspicious, given that the vehicles arrived at the site traveling slowly, closely together, braking periodically, stopping at known pick-up areas, and finally turning around and reversing direction to travel eastbound.

**[5]** In light of the totality of the circumstances, giving due weight to the officers' experience and reasonable deductions, we conclude that the officers had a reasonable, particularized basis for suspecting the vehicles of picking up illegal aliens, and that their stop was supported by reasonable suspicion. Accordingly, we reject Berber's arguments that the grounds for the officers' suspicions lacked particularity and that each of the factors, taken individually, is susceptible of innocent explanation. *See Arvizu*, 534 U.S. at 273-75. Alternate explanations for individual factors are unpersuasive if the factors, "when viewed in their totality . . . create reasonable suspicion of criminal activity." *Diaz-Juarez*, 299 F.3d at 1142.

III

**[6]** Berber argues that even if we determine that the investigatory stop was based on reasonable suspicion, we must reverse the district court for violating Rule 605 of the Federal Rules of Evidence when the judge made interjections based on his own knowledge during the suppression hearing.**²** Rule 605 provides that "[t]he judge presiding at the trial may not testify in that trial as a witness."

Berber claims that a number of the judge's interjections violated Rule 605. First, the judge interrupted defense coun-

---

**²**Berber stated that the judge violated 28 U.S.C. § 455(b)(1) by failing to disqualify himself on the ground that he had "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). However, Berber has failed to develop this argument, and it may be deemed abandoned. *See* Fed. R. App. P. 28(a)(9)(A); *United States v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir. 1997). Moreover, the argument is meritless, because none of the judge's interjections related to evidentiary facts that were disputed by the parties.

sel's questions to Officer Engelhorn regarding the stop signs on Lyons Valley Road, and the following exchange took place:

> Court: Counsel, let me interrupt you for just a second. I'm really familiar with that area. So if you're doing this for my benefit, you can stop because I happen to know where that stop sign is and what's further on down at Lyons Valley.

> Defense counsel: This is also for my edification, Your Honor.

> Court: This is discovery. This is not a discovery motion.

> Defense counsel: I understand, Your Honor; however, it is important to my argument. I would like to find out from the officer.

> Court: The problem is you're unduly consuming time. The next stop sign beyond that is at Lawson Valley Road, which is a long ways down the road, so why don't you move on.

In subsequent cross-examination, defense counsel again asked Officer Lenoir about the stop signs on Lyons Valley Road. The officer testified that there were two stop signs, but the judge interjected, "Actually, I think there's four, counsel." The judge went on at some length:

> Court: Well, there's four. Including the whole distance of Lyons Valley Road, there's four. The area he's talking about there's one at the intersection of Lyons and Japatul, and there's one at Four Corners, which is the intersection of Honey Springs, Lyons Valley, and Skyline Truck Trail, and it's a distance of about seven miles between those two stretches.

If that's what you're talking about, which I think is what the officer's talking about, for my purposes, for the purposes of the hearing today, it doesn't do any good to talk about the second stop sign, or the third stop sign at Lawson Valley road, or the fourth stop sign, which is down by Skyline Truck Trail, again, down at the—almost the intersection of 94.

Defense Counsel: But there is at least one stop sign in this area.

Court: There's a stop sign up at Four Corners, and there's a stop sign at Japatul Valley Road and Lyons Valley Road. So if you look at it as a piece of string, at both ends of that string there are stop signs, okay.

Later, in summing up the evidence, the district court stated:

First of all, that's an extremely rural and somewhat mountainous area. There's really not much between there and Highway 94 that's right to the border of Mexico, other than the mountains, so to speak. That's a fairly narrow road running from Japatul Valley Road to the intersection with Honey Springs, not a whole lot of traffic on that road at 10:30 at night.

The evidence before me shows the following: there were two vehicles traveling together in a very rural, remote area of the county, known to be notorious for alien smuggling. They're traveling slowly. They brake periodically. They stop. They keep going. They turn around. One of the vehicles again stops. And at that point in time the officer, who has had a report of a seismic intrusion device, as I said, that whole area is—I guess it's south of Lyons Valley Road—is very mountainous, so it makes sense that what these officers are waiting for is for someone to

come out of that area, after having triggered the motion—the seismic device, and so all this is consistent with someone who is driving around looking to pick up someone.

I guess one could make the argument, if it was one vehicle, perhaps, there wouldn't be probable cause or reasonable suspicion to pull these vehicles over. If there were two vehicles, and they were going in one direction, and they were traveling at the rate of speed—

By the way, I think, [Defense Counsel], I may be mistaken on this, but I think the speed limit in California, unless otherwise posted, is 55 miles an hour. So if the vehicle is traveling between 20 and 35 miles an hour, which is a very low rate of speed in a rural area, stopping periodically along areas where the officers know that people are going to be picked up, and particularly following setting off a seismic device, I believe that that's enough to create reasonable suspicion.

I don't think that the law requires that the officers actually see someone load into the vehicles. In fact, in that type of area, I suspect that it's probably very difficult to see that sort of thing, which is—that's why they use that area.

Berber claims that the judge relied on personal knowledge in commenting on the location of the stop signs and in making the following six statements: (1) the area at issue is an "extremely" rural area; (2) "there's not much between there and Highway 94 that's right to the border of Mexico"; (3) "that's a fairly narrow road running from Japatul Valley Road to the intersection with Honey Springs"; (4) there is "not a whole lot of traffic on that road at 10:30 at night"; (5) "I may be mistaken on this, but I think the speed limit in California, unless

otherwise posted, is 55 miles an hour. So if the vehicle is traveling between 20 and 35 miles an hour, which is a very low rate of speed in a rural area . . . .”; and (6) “in fact, in that type of area, I suspect that it’s probably very difficult to see that sort of thing [loading of aliens], which—that’s why they use that area.” Berber claims these interjections violated Rule 605.

**[7]** We agree that the judge violated Rule 605 when he interjected his own observations regarding the location of the stop signs along the Lyons Valley Road and the narrowness of the road from Japatul Valley Road to the intersection with Honey Springs. At the time the judge first stated these facts, they were not in the record nor were they reasonable inferences from the record. Although a closer call, the judge also violated Rule 605 when he relied on personal knowledge to conclude that no speed limit was posted on Lyons Valley Road and therefore the speed limit was 55 miles per hour. Although a court might be able to take judicial notice of a speed limit under some circumstances, *see* FED. R. EVID. 201(b); *United States v. Bradford*, 78 F.3d 1216, 1221 n.8 (7th Cir. 1996), the judge here provided a personal conjecture, rather than a judicially noticed fact.

**[8]** A trial judge is not a competent witness to such factual issues. *See United States v. Lewis*, 833 F.2d 1380, 1385 (9th Cir. 1987) (citing FED. R. EVID. 605). Nor can the judge take judicial notice of such issues. “A trial judge is prohibited from relying on his personal experience to support the taking of judicial notice. ‘It is therefore plainly accepted that the judge is not to use from the bench, under the guise of judicial knowledge, that which he knows *only as an individual* observer outside of court.’ ” *Id.* (quoting 9 J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2569, at 723) (J. Chabourn rev. ed. 1981). The type of specific personal knowledge offered by the judge is not akin to the general knowledge we have found acceptable in other contexts. *See United States v. Mariscal*, 285 F.3d 1127, 1131-32) (9th Cir. 2002) (holding

that judicial knowledge that a road is heavily traveled is "nothing like the obvious fact that surgery is painful and can have dire consequences" or "like common knowledge about the general shape of snowmen"). While a resident judge's background knowledge of an area may "inform the judge's assessment of the historical facts," *Ornelas v. United States*, 517 U.S. 690, 700 (1996), the judge may not actually testify in the proceeding or interject facts (excluding facts for which proper judicial notice is taken). Therefore, the judge erred in making his observations about such issues.

The other statements made by the judge in summing up the evidence did not violate Rule 605. The assertions that the area at issue was extremely rural and sparsely populated were supported by the record, given the officers' testimony that the area at issue was a rural, remote area, with few residences and no businesses other than a fire station and a detention center. Similarly, the judge's statement that there would be little traffic on the road at 10:30 at night could be reasonably inferred from the officers' testimony that the road was in a remote area. Finally, the judge's inference that it was probably difficult to see the alien loading activity was supported by the officers' testimony that they did not have a complete view of the vehicles. A judge may make reasonable inferences from the record in summing up the evidence without violating Rule 605. *See Ornelas*, 517 U.S. at 699.

**[9]** Given our conclusion that three of the judge's remarks violated Rule 605, we must next determine whether such violations are subject to harmless error review and, if so, whether these errors were harmless. In evaluating other violations of the Federal Rules of Evidence, we have held that we need not reverse a district court's decision so long as we have a " 'fair assurance' that the verdict was not substantially swayed by error." *United States v. Seschillie*, 310 F.3d 1208, 1214 (9th Cir. 2002); *see also United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc). This standard is equally applicable to violations of Rule 605. *See United States v. Nickl*,

427 F.3d 1286, 1293 (10th Cir. 2005) (applying harmless error review to a Rule 605 violation).

**[10]** We reject Berber's argument that a Rule 605 error constitutes a structural constitutional error requiring reversal. The Supreme Court has held that only "a limited class of fundamental constitutional errors" are structural errors, and not subject to harmless error analysis. *Neder v. United States*, 527 U.S. 1, 7 (1999). These structural errors include the complete denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.* at 8. Berber claims that a judge's interjections in violation of Rule 605 destroy the court's image of impartiality and thus violate a defendant's constitutional right to an unbiased trial judge. However, as we recently noted, the Supreme Court has required recusal due to an appearance of bias (as opposed to actual bias) only when a judge: (i) has a "direct, personal, substantial pecuniary interest" in the outcome; (ii) becomes "embroiled in a running, bitter controversy" with a party; or (iii) participates as "part of the accusatory process." *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (internal quotation marks omitted). Rule 605 violations will rarely rise to this level. A judge's conduct during judicial proceedings "should not, except in the 'rarest of circumstances' form the sole basis for recusal under § 455(a)." *United States v. Holland*, 501 F.3d 1120, 1124-25 (9th Cir. 2007) (footnote omitted). *See also Nickl*, 427 F.3d at 1296-99. We therefore decline to hold that a Rule 605 violation, without more, mandates reversal. Here, there was no evidence of actual bias, and the judge's conduct does not fall within the three circumstances where the Supreme Court has required recusal.

Because we conclude that this Rule 605 error does not rise to the level of a structural constitutional error, we apply the harmless error standard and consider whether there is a "fair assurance," based on an independent review of the record,

that the judge's unsupported remarks did not affect the decision to deny Berber's motion to suppress. *See Seschillie*, 310 F.3d at 1214. We undertook a similar inquiry in both *Mariscal* and *Lewis*. In *Mariscal*, the district court considered whether an officer had reasonable suspicion to stop a defendant for failure to give a turn signal "in the event any other traffic may be affected by the movement." 285 F.3d at 1131 (quoting Ariz. Rev. Stat. § 28-754(A)). Although the prosecution failed to introduce any evidence as to whether traffic could be affected by the defendant's turn, the district court judge concluded that this factor was met because " 'McDowell Road is a heavily traveled east-west street in the City of Phoenix.' " *Id.* Because there was insufficient reasonable suspicion for the stop absent the judge's observation, we determined that "the objective facts of record" did not support the determination that there was reasonable suspicion for the stop. We therefore reversed the district court's order denying the motion to suppress. *Id.* at 1133.

[11] Here, by contrast, the judge's interjections regarding the stop signs and the statement that the road from Japatul Valley Road to the intersection with Honey Springs was narrow did not fill in any critical evidentiary gaps in this case. The judge's conjecture as to the speed limit and subsequent comparison of the slow speed of the vehicles to a speed limit of 55 miles an hour was cumulative, given the officers' testimony that the vehicles were traveling at no more than 30 miles per hour, and that traffic typically travels at 50 miles per hour. An independent review of the record, striking the erroneous judicial comments, supports the district court's ultimate ruling that the officers in this case had reasonable suspicion to stop the vehicle in which Berber was traveling. Moreover, as in *Lewis* and *Mariscal*, there is no serious concern here that the judge's comments and personal knowledge influenced any aspect of the trial or hearing other than the judge's own determination.[3] The judge did not, for instance, make damaging state-

---

[3]Berber claims the judge's statements regarding the location of the stop signs "tipped off" the prosecutor to Berber's theory that the cars were

ments to the jury. *Cf. United States v. Pritchett*, 699 F.2d 317, 320 (6th Cir. 1983) (holding that the trial judge's statements in front of the jury that one of defendant's acquaintances was a convicted cocaine dealer created "a sufficient risk of prejudice" requiring reversal).

**[12]** It was inappropriate for the judge to interrupt questioning in order to interject his personal knowledge of facts outside the record. Nevertheless, because we can say with fair assurance that the district court's violations of Rule 605 were harmless, we affirm.

**AFFIRMED**

---

braking on the road because of the stop signs and not to pick up aliens at loading points. However, the defense counsel's initiation of a line of questions about the stop signs was sufficient to "tip off" the prosecutor. Berber also claims that the judge erroneously curtailed this line of inquiry. Given the district court's "wide discretion in limiting the scope of cross-examination," the court did not err in cutting short the questions about the stop signs. *United States v. Payne*, 944 F.2d 1458, 1469 (9th Cir. 1991). Moreover, despite the judge's interruptions, the defense counsel was able to elicit testimony from the two officers regarding the location of the stop signs on Lyons Valley Road.