**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

RUFINO IGNACIO VALDES-VEGA,
  *Defendant-Appellant.*

No. 10-50249

D.C. No.
5:09-cr-00024-
VAP-1

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
December 5, 2011—Pasadena, California

Filed July 25, 2012

Before: Harry Pregerson and Mary H. Murguia,
Circuit Judges, and Suzanne B. Conlon, District Judge.*

Opinion by Judge Pregerson;
Dissent by Judge Conlon

*The Honorable Suzanne B. Conlon, District Judge for the U.S. District Court for Northern Illinois, sitting by designation.

## COUNSEL

Gretchen Fusilier, Carlsbad, California, for the defendant-appellant.

Daniel Ackerman, Assistant United States Attorney, Riverside, California, for the plaintiff-appellee.

## OPINION

PREGERSON, Circuit Judge:

Defendant Rufino Ignacio Valdes-Vega ("Valdes-Vega") appeals the district court's denial of his motion to suppress cocaine found in his truck. Valdes-Vega contends that the

stop of his truck by Border Patrol Agents 70 miles north of the U.S.-Mexico Border violated the Fourth Amendment, and consequently, the cocaine found in his truck must be suppressed. We agree. The totality of the circumstances in this case did not provide Border Patrol Agents with reasonable suspicion to believe that Valdes-Vega was smuggling drugs or aliens. Accordingly, we reverse the district court's denial of Valdes-Vega's motion to suppress.

## BACKGROUND

### A. The Stop of Valdes-Vega's Truck

On January 21, 2009, Border Patrol Agent Luis Lopez was conducting surveillance in an unmarked vehicle on the northbound shoulder of Interstate 15 ("I-15"), near Fallbrook, California, approximately 70 miles north of the U.S.-Mexico Border. At approximately 2:00 p.m., Agent Lopez observed a red Ford F-150 pickup truck in the far right northbound lane "traveling faster than the flow of traffic." Agent Lopez began to follow the truck. While he was following the truck, Agent Lopez observed the truck make "erratic lane changes without signaling." As Agent Lopez followed the truck, he noticed the truck had Baja California license plates. Eventually, Agent Lopez lost sight of the truck because it was moving too quickly and was "weaving in and out of traffic." Agent Lopez then notified Border Patrol Agent Jeffrey Hays of his observations and asked Agent Hays to provide assistance.

Agent Hays was on patrol in a marked vehicle when he received Agent Lopez's request for assistance. After speaking with Agent Lopez, Agent Hays entered I-15 at Mission Road, headed northbound, and attempted to catch up with the truck. Agent Hays eventually caught up with the truck just south of the Temecula Border Patrol Checkpoint ("Temecula Checkpoint"). At this point, it appeared to Agent Hays that the truck was traveling "over 90 miles per hour." According to Agent

Hays, the flow of traffic at that time of day on I-15 was 70 to 80 miles per hour.

While he was following the truck, Agent Hays observed the truck change lanes without signaling. Agent Hays then observed the truck slow to 70 miles per hour as it approached the Temecula Checkpoint, which was not operational that day. The truck then moved over to the number two lane by cutting in front of the vehicles directly behind it. After the truck passed the Temecula Checkpoint, Agent Hays pulled along-side the passenger side of the truck and observed a man (who was later identified as Valdes-Vega) behind the wheel.[1] Valdes-Vega was looking straight ahead and did not make eye contact with Agent Hays. Agent Hays noticed that the truck had an older body style, appeared clean, and had Baja California license plates. At this point, Agent Hays concluded that the driver's behavior "was consistent with the behavior of alien and drug smugglers who encounter law enforcement in this area," and decided to stop the vehicle. Approximately a mile and a half past the Temecula Checkpoint, Agent Hays turned on his emergency lights and stopped the truck. Valdes-Vega consented to a subsequent search of his truck, which revealed approximately 7.991 kilograms of cocaine.

## B.   The District Court Proceedings

Valdes-Vega was indicted on one count of possession with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Valdes-Vega moved to suppress the cocaine found in his truck, claiming that the cocaine was obtained in violation of the Fourth Amendment. After holding an evidentiary hearing, the district court denied Valdes-Vega's motion to suppress.

---

[1]There were no passengers in the truck. Valdes-Vega was the only occupant of the truck.

In denying Valdes-Vega's motion to suppress, the district court found that the "totality of the circumstances" satisfied the reasonable suspicion standard required to stop a vehicle. Specifically, the district court found that the following facts, when aggregated, provided Agents[2] with reasonable suspicion for the vehicle stop:

- Proximity to the Border: The district court cited the proximity of the stop to the U.S./Mexico border (70 miles from the border).

- Traffic Patterns: The district court noted that the speed of Valdes-Vega's vehicle (90 miles per hour) was not typical for traffic in that area at that time of day, which Agent Hays testified was 70 to 80 miles per hour.

- The behavior of the driver: The district court noted that Valdes-Vega had an "erratic driving pattern" because he "was speeding, changing lanes frequently, or weaving in and out of traffic, [and] braking unexpectedly in front of other drivers." The district court also noted that Valdes-Vega's "behavior changed" abruptly just south of the checkpoint because he "slowed down and then sped up to get through [the checkpoint] as quickly as possible."

- The model and appearance of the vehicle: The district court noted that Valdes-Vega's truck had Baja California license plates and "was a large truck, a Ford F-150, which meant that it was more suited to carrying large amounts of contra-

---

[2]Under the "collective knowledge doctrine," the observations of both Agent Lopez and Agent Hays must be considered in the totality of the circumstances analysis. *See United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (discussing "collective knowledge doctrine").

band, drugs, or perhaps human beings. And it was also harder for any law enforcement officer to see into the vehicle to see if that was the case."

• The district court also relied on the history of "previous alien or drug smuggling in the area."

• The district court also cited the experience and training of Border Patrol Agents Lopez and Hays.[3]

After the district court denied his motion to suppress, Valdes-Vega entered a conditional guilty plea to the sole count of the indictment, reserving the right to appeal the district court's denial of his motion to suppress.

## STANDARD OF REVIEW

We review the district court's denial of a motion to suppress evidence de novo. *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). The district court's findings of fact are reviewed for clear error. *Id.*

## DISCUSSION

### I.  The Reasonable Suspicion Standard & Border Patrol Stops

[1] "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). "Be-

---

[3]Agent Hays has been a Border Patrol Agent for eleven years and had participated in approximately 200 arrests of individuals for alien or narcotic smuggling near the Temecula Checkpoint. Agent Lopez has been a Border Patrol Agent for eight years and participated in approximately 50 arrests of individuals for alien or narcotic smuggling near the Temecula Checkpoint.

cause the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Id.* (internal citations and quotation marks omitted). Despite being less stringent than probable cause, reasonable suspicion "nevertheless requires an objective justification for [an investigatory] stop." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). An officer may not, therefore, stop a motorist based solely on a hunch. *Id.* "Rather, reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Id.*

   **[2]** In evaluating whether the stop of a vehicle satisfies the reasonable suspicion standard, we must look to the "totality of the circumstances." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted). When a border patrol stop is at issue, the totality of the circumstances may include:

> (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience.

*Berber-Tinoco*, 510 F.3d at 1087 (quoting *United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997)). Under the totality of the circumstances approach, reasonable suspicion may exist even when each individual fact is susceptible to an innocent explanation or is not probative. *Arvizu*, 534 U.S. at 277. This approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information avail-

able to them that might well elude an untrained person." *Id.* at 273. The court, however, "will defer to officers' inferences only when such inferences rationally explain how the objective circumstances 'arouse[d] a reasonable suspicion that *the particular person being stopped* ha[d] committed or [was] about to commit a crime.' " *United States v. Manzo-Jurado*, 457 F.3d 928, 934-935 (9th Cir. 2006) (quoting *Montero-Camargo*, 208 F.3d at 1129). Accordingly, "reasonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (internal quotation marks omitted); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) ("The other circumstances [relied upon by officers] describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.").

With these principles in mind, we turn to the facts of this case.

## II. The Totality of the Circumstances Did Not Provide Border Patrol Agents with Reasonable Suspicion to Believe that Valdes-Vega was Smuggling Drugs or Aliens

Agent Hays's offered justification for the stop of Valdes-Vega's vehicle was his belief that Valdes-Vega's behavior "was consistent with the behavior of alien and drug smugglers who encounter law enforcement in [the] area." We find that the totality of the circumstances in this case fall short of providing reasonable suspicion to believe that Valdes-Vega was smuggling drugs or aliens. To the contrary, as discussed below, the totality of the circumstance reveal a driver with Mexican license plates committing traffic infractions on an interstate 70 miles north of the U.S.-Mexico Border; a

description that describes too broad a category of people to justify reasonable suspicion.

### A.   Proximity to the Border and Characteristics of the Area

[3]  In concluding that Border Patrol Agents had reasonable suspicion to stop Valdes-Vega's vehicle, the district court relied on the proximity of the stop to the U.S.-Mexico Border and the history of alien and drug smuggling in the area. Specifically, the district court found it significant that the stop occurred 70 miles from the U.S.-Mexico Border and occurred on I-15, which, according to Agents Lopez and Hays "is commonly used by alien and drug smugglers to transport illegal aliens and drugs into the United States." Unlike the district court, we conclude that driving a vehicle on a major interstate, 70 miles from the border, is entitled to little weight in the totality of the circumstances analysis.

[4]  According to the California Department of Transportation, the portion of Interstate 15 where Valdes-Vega was stopped has an average daily traffic of 290,000 vehicles.[4] As we have explained, "A location or route frequented by illegal immigrants, but also by many legal residents, is not significantly probative to an assessment of reasonable suspicion." *Manzo-Jurado*, 457 F.3d at 936; *United States v. Brignoni-Ponce*, 422 U.S. 873, 882 (1975) ("Roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well."). Indeed, to hold that a vehicle's appearance 70 miles from the border is highly significant would effectively cast suspicion on all of the vehicles in San Diego County, the fifth largest county in the country, with a population of over three million.[5] *See Sigmond-*

---

[4]Interstate 15 Corridor System Management Plan, California Department of Transportation, at 11, www.dot.ca.gov/dist11/departments/planning/pdfs/systplan/01-I-15CorridorSystemManagementPlanJanuary 2009.pdf.

[5]County Totals: Vintage 2011, United States Census Bureau, http://www.census.gov/popest/data/counties/totals/2011/index.html (click on link for "100 Largest Counties").

*Ballesteros*, 285 F.3d at 1126 ("Even assuming that the checkpoint is close to the border, that factor is of limited value here considering the presence of two large metropolitan areas north of the stop."); *United States v. Olivares-Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011) (" '[A] car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there.' " (internal quotation marks omitted)) (quoting *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999)). Furthermore, the Agents did not identify any particular characteristics of this portion of I-15 that gave them particularized reason to suspect Valdes-Vega was engaged in smuggling. *See Arvizu*, 534 U.S. at 269 (finding it significant that officers found the defendant on an unpaved road "very rarely traveled except for use by local ranchers and forest service personnel," but commonly used by smugglers to avoid a nearby border checkpoint).

## B.   Traffic Patterns and Behavior of the Driver

[5] In concluding that the Agents had reasonable suspicion to stop Valdes-Vega's vehicle, the district court relied on Valdes-Vega's "erratic" driving pattern, which included: driving ten miles per hour faster than the flow of traffic, braking unexpectedly in front of other drivers, and making lane changes without signaling. Although relevant to a reasonable suspicion analysis, "traffic infractions alone do not create a reasonable suspicion of transporting aliens." *United States v. Palos-Marquez*, 591 F.3d 1272, 1278 (9th Cir. 2010). While we do not condone Valdes-Vega's violation of the traffic laws, we nevertheless conclude that, in the circumstances of this case, Valdes-Vega's driving behavior was not highly probative of smuggling drugs or aliens. *See United States v. Fernandez-Castillo*, 324 F.3d 1114, 1120 (9th Cir. 2003) ("It is perfectly understandable that swerving within one's own

lane of traffic would not support reasonable suspicion of smuggling, which has nothing to do with impairment.").[6]

While a suspect's "unprovoked flight" from officers may give rise to a reasonable suspicion, *see Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000), here, no such unprovoked flight took place. To the contrary, Valdes-Vega was already "traveling faster than the flow of traffic" when Agent Lopez spotted his vehicle. Although Valdes-Vega made "erratic lane changes without signaling" after Agent Lopez began following him, Agent Lopez was traveling in an *unmarked* vehicle. This behavior continued even as Agent Hays followed Valdes-Vega in a *marked vehicle*, suggesting that Valdes-Vega's driving was not influenced by the Agents' presence and, therefore, cannot be categorized as flight.

[6] Furthermore, we place little stock in the fact that Valdes-Vega slowed down as he approached the closed Temecula Checkpoint. Agent Hays testified that smugglers often speed through the Checkpoint when it is non-operational, but sometimes slow down so as not to bring attention to themselves. Based on this testimony, "[it] is, in fact, difficult to imagine what [Defendant] could have done at that point that might not have appeared suspicious to a Border Patrol agent." *Sigmond-Ballesteros*, 285 F.3d at 1122 (internal quotation marks omitted). This Court looks with disfavor

---

[6]Ordinarily, an officer's observance of a traffic violation, by itself, is sufficient for a vehicle stop. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005). But Border Patrol Agents, unlike state and local law enforcement agents, do not have authority to arrest or cite individuals for traffic violations. *See* 8 U.S.C. § 1357 (detailing authority of immigration officers to arrest and detain); 8 C.F.R. § 287.5 (detailing authority of immigration officers to arrest and detain); Cal. Penal Code § 830.8 (limiting authority of federal agents in California to arrest persons for violations of state and local laws). Because the Border Patrol Agents who stopped Valdes-Vega did not have the authority to enforce California traffic laws, Valdes-Vega's violation of California traffic laws cannot form the sole basis for the vehicle stop. *See Palos-Marquez*, 591 F.3d at 1278.

upon officers' reliance on this type of "damned if you do, damned if you don't" consideration. *Montero-Camargo*, 208 F.3d at 1136; *see United States v. Diaz-Juarez*, 299 F.3d 1138, 1148 (9th Cir. 2002) (Ferguson, J. dissenting) ("We have frowned on speed of the vehicle as a basis for reasonable suspicion . . . , pointing out that the government has argued both increases and decreases in speed constitute suspicious' conduct, creating a heads I win, tails you lose trap for drivers who do not maintain constant speed.") (internal quotation marks omitted)).

Additionally, while the district court speculated that Valdes-Vega's passage through the Temecula Checkpoint at a time when it was non-operational "could be significant" because Valdes-Vega could have been using "a lookout," the Agents did not know the last time the Checkpoint had been open. Accordingly, there is nothing in the record from which we might infer that the timing of Valdes-Vega's arrival at the Checkpoint was not a coincidence, such as "evidence indicating that the checkpoint was known to be closed more often than not at that particular time of day." *Sigmond-Ballesteros*, 285 F.3d at 1125.

**[7]** Moreover, unlike the district court, we do not find it significant that Valdes-Vega did not make eye contact with Agent Hays. "In general, although eye contact, or the lack thereof, may be considered as a factor establishing reasonable suspicion, we have noted that whether the contact is suspicious or not is highly subjective and must be evaluated in light of the circumstances of each case." *Montero-Camargo*, 208 F.3d at 1136 (internal quotation marks omitted). Valdes-Vega was driving on a major interstate at a high rate of speed when Agent Hays pulled up along side him. In these circumstances, Valdes-Vega's decision to keep his eyes on the road instead of on Agent Hays was hardly suspicious. *See Arvizu*, 534 U.S. at 275-76 (noting that a driver's failure to make eye contact with an officer on a busy highway is "unremarkable").

*C.   Model and Appearance of the Vehicle*

**[8]**  In finding reasonable suspicion, the district court noted that Valdes-Vega's truck had Baja California license plates and "was a large truck, a Ford F-150, which meant that it was more suited to carrying large amounts of contraband, drugs, or perhaps human beings. And it was also harder for any law enforcement officer to see into the vehicle to see if that was the case." The presence of Mexican license plates is normally entitled to some weight in evaluating a vehicle stop by Border Patrol Agents. *See Montero-Camargo*, 208 F.3d at 1139 ("While having Mexican plates is ordinarily of no significance, where the criminal act suspected involves border-crossing, the presence of foreign license plates may be afforded some weight in determining whether a stop is reasonable."). Nevertheless, we ascribe little weight to the appearance of Mexican license plates here because Valdes-Vega's vehicle was 70 miles from the border. *Cf. United States v. Guzman-Padilla*, 573 F.3d 865, 882 (9th Cir. 2009) (noting that the officer testified that it was rare to see Mexican plates where he spotted the defendant's vehicle). As the Fifth Circuit has explained, "a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." *Olivares-Pacheco*, 633 F.3d at 402 (internal quotation marks omitted).

**[9]**  We likewise afford little weight to the make and model of Valdes-Vega's vehicle: an F-150 pickup truck. As even Agent Hays acknowledged during his testimony "numerous types of vehicles" are used to smuggle drugs and aliens, and we have recognized that "light trucks and pick ups, although sometimes used by smugglers . . . have been popular best-sellers, and are commonly used by those who are engaged in agricultural work, the construction trades, or any other trade which requires the carrying of heavy tools or implements." *Sigmond-Ballesteros*, 285 F.3d at 1125. Additionally, the Agents were unable to point to specific and particularized

characteristics of Valdes-Vega's truck that support an infer-ence it was more suspicious than an average Ford F-150. *See Diaz-Juarez*, 299 F.3d at 1142 (noting that the defendant's car had modified suspension and bounced erratically over small bumps, "common characteristics of vehicles used for smug-gling."). We need not credit Agent Hays's testimony that the clean appearance of Valdes-Vega's truck made it suspicious, as Agent Hays based this inference on an unsubstantiated and dubious assertion that officers do not commonly see clean vehicles with Baja California plates due to the abundance of dirt roads in Mexico.[7] *Montero-Camargo*, 208 F.3d at 1129 (explaining that reasonable suspicion must be based on facts combined with "*objective and reasonable inferences*") (emphasis added)).

## D. The Totality of the Circumstances Did Not Provide Agents with Reasonable Suspicion to Believe that Valdes-Vega Was Smuggling Drugs or Aliens

[10] The facts of this case, when considered cumulatively, do not create a reasonable suspicion that Valdes-Vega was smuggling drugs or aliens. Taken together they reveal the fol-lowing profile: a Ford F-150 pickup truck, with Baja Califor-nia plates, being erratically driven on I-15, 70 miles north of the border, at approximately 2:00 in the afternoon, that slowed down as it passed through the closed Temecula Checkpoint, and whose driver failed to look a Border Patrol Agent in the eyes. Putting aside the erratic driving, this description likely "fit[s] hundreds or thousands of law abiding daily users of the highways of Southern California." *United States v. Rodriguez*, 976 F.2d 592 (9th Cir. 1992), *amended by* 997 F.2d 1306 (9th Cir. 1993).

---

[7]Furthermore, we view the Government's emphasis on Officer Hays' cleanliness observation with some skepticism. In another case before this panel, *United States v. Pacheco-Garcia*, No. 11-50047, the Government argued that dirt on the defendants' vehicle was a circumstance supporting reasonable suspicion for a roving border stop.

**[11]** The question, then, is whether the addition of the erratic driving to this equation pushes this otherwise innocent profile to a reasonably suspicious one. *See Manzo-Jurado*, 457 F.3d at 939 (explaining that Agents "must also observe additional information that winnows the broad profile into an objective and particularized suspicion of the person to be stopped."). We conclude that it does not. The Agents had reason to be suspicious when they saw Valdes-Vega driving erratically. The facts on which they relied, however, in converting that suspicion into reasonable suspicion were exceedingly general and not highly probative in the circumstances. Even when those facts are viewed together they fall short of providing a "particularized and objective" basis for suspecting that Valdes-Vega was engaged in anything other than unlawful driving. To hold otherwise, would sanction the use of a profile that would effectively subject every driver with Mexican license plates to stops by Border Patrol Agents, many miles from the border, simply for committing traffic infractions. Of course, border agents are entitled to rely on their experience, but "experience may not be used to give [them] unbridled discretion in making a stop." *Diaz-Juarez*, 299 F.3d at 1141. Here, the Agents' experience is insufficient to overcome the broad and generalized profile on which they relied in stopping Valdes-Vega.

The dissent states that we have used the "divide-and-conquer" methodology prohibited by the Supreme Court in *Arvizu*. We disagree. *Arvizu* merely clarified that a proper totality of the circumstances analysis must not exclude facts that are minimally probative or are susceptible to innocent explanation. 534 U.S. at 274 (criticizing the appellate court for concluding that each fact "was by itself readily susceptible to an innocent explanation was entitled to 'no weight.' "). We have not declined to consider any of the facts on which the Agents relied.

Furthermore, we reject the dissent's suggestion that it is wrong to consider the strength of each fact individually before

viewing them collectively. "After *Arvizu* it is still the function of the courts *to review an officer's asserted grounds for suspicion* and determine whether collectively they provide an objectively reasonable basis," for an immigration stop. *United States v. Crapser*, 472 F.3d 1141, 1156 n.7 (9th Cir. 2007) (emphasis added) (Reinhardt, J., dissenting). While we may not disregard as irrelevant a fact with low probative value (dividing and conquering), we need not pretend that the probative value of all facts is equal. *See id.* (noting "[the officer's] assessment of respondent's reactions upon seeing him and the children's mechanical-like waving, which continued for a full four to five minutes, *were entitled to some weight*." (emphasis added)); *see also Manzo-Jurado*, 457 F.3d at 936 (going through the facts relied upon by the officers and noting, in some instances, their probative value); *Sigmond-Ballesteros*, 285 F.3d at 1122-26 (same). We think it uncontroversial to say that, when viewed in totality, a collection of facts that are each highly probative of criminal activity is more likely to support a finding of reasonable suspicion than a set of facts which are not.

**[12]** Of course, we acknowledge that reasonable suspicion may be found where "each . . . factor[ ] alone is susceptible of innocent explanation." *Arvizu*, 534 U.S. at 277. The totality of the circumstances approach, however, is not susceptible to bright line rules. *Id.* at 276 (noting that "a totality of the circumstances approach may render appellate review less circumscribed by precedent than otherwise . . . ."). Here, the facts on which the agents relied are not highly probative, and this is one such case where, even when viewed together, they do not amount to reasonable suspicion. As a result, the stop was unlawful and the district court erred in denying Valdes-Vega's motion to suppress.

## CONCLUSION

We REVERSE the district court's denial of Valdes-Vega's motion to suppress and REMAND for proceedings consistent with this opinion.

CONLON, District Judge, dissenting:

The district court correctly considered the totality of the circumstances in concluding the record met the reasonable suspicion standard for the Border Patrol's stop of Valdes-Vega's truck. Accordingly, I would affirm the district court's denial of the motion to suppress 7.991 kilograms of cocaine found in the truck after the stop.

Experienced Border Patrol agents observed Valdes-Vega's F-150 pickup truck, with a Baja California license plate, traveling northbound at over 90 m.p.h. on Interstate 15 near the Temecula border checkpoint station. The area is recognized as a smuggling corridor. *See United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1490 (9th Cir. 1994), *overruled in part on other grounds by United States v. Montero-Camargo*, 208 F.3d 1122, 1131-32 (9th Cir. 2000) (*en banc*). The posted speed limit is 70 m.p.h.; the F-150 was moving faster than the flow of traffic. The agents observed the large pickup was driven erratically, weaving in and out of traffic lanes without signaling and causing other drivers to apply their brakes. After the first Border Patrol agent who attempted to follow the pickup lost sight of the speeding truck, he radioed for another agent to enter the interstate further north.

The second Border Patrol car was able to catch up with the pickup. In all, the agents observed Valdes-Vega's erratic driving for several miles; his abrupt lane changes without signaling were repeated at least ten times. In the agents' experience, an F-150 pickup is capable of carrying and concealing large amounts of drugs or human contraband. The pickup slowed to 70 m.p.h. passing the closed Temecula checkpoint.

The second Border Patrol agent turned on his emergency lights a mile and a half past the checkpoint and pulled alongside the pickup. Initially, the sole occupant, Valdes-Vega, continued to look straight ahead, but after a brief hesitation, pulled over to the side of the road at the agent's direction.

Giving due weight to *all* these circumstances and the factual inferences drawn by the agents and the district court, the agents had reasonable suspicion to believe Valdes-Vega was involved in illegal activity. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing"). Valdes-Vega's driving constituted more than mere traffic violations. He was not just speeding, but driving recklessly near the last checkpoint from the Mexican border in a vehicle not particularly designed for speed. It is a reasonable inference that the driver of the truck was driving in such a manner to reach the checkpoint quickly and slowed down at the checkpoint itself in an attempt to avoid drawing attention to himself. It is a further reasonable inference that the driver wanted to cross the checkpoint quickly to evade detection by law enforcement and avoid discovery of criminal activity.

The majority repeatedly recognizes that the totality of the circumstances must be considered in determining whether the agents had reasonable suspicion to stop the truck for further investigation. However, the majority does not actually apply this standard. Rather, their analysis splinters the totality of the circumstances into innocuous factors. This is the "divide and conquer" methodology expressly rejected in *Arvizu*. 534 U.S. at 274 ("The [appellate] court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase"); *see also United States v. Sokolow*, 490 U.S. 1, 7-8 (1989) (totality of the circumstances must be considered); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (same); *United States v. Palos-Marquez*, 591 F.3d 1272, 1277-78 (9th Cir. 2010) (rejecting defendant's "attempt to discredit individually each of the facts used by agents to determine if there was reasonable suspicion to initiate the

stop"); *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087-89 (9th Cir. 2007) (same).

The majority finds that

- driving a vehicle on a major interstate, 70 miles from border is entitled to little weight and this factor is not highly relevant;

- driving on Interstate 15, which may be used by smugglers, is entitled to little weight;

- Valdes-Vega's erratic driving pattern was not highly probative of smuggling drugs or aliens;

- his slowing down as he passed the checkpoint was not relevant;

- his failure to make eye contact with an agent who pulled alongside him was irrelevant and hardly suspicious;

- the truck's Mexican license plate is given little weight because the truck was 70 miles from the border;

- the use of a F-150 pickup truck is afforded little weight because smugglers use numerous types of vehicles; and

- the uncharacteristic cleanliness of a truck with a Baja California plate is entitled to no weight because the experienced agent's skepticism regarding the vehicle's cleanliness is "unsubstantiated and dubious" and, in another case, the government argued a dirty vehicle supported reasonable suspicion.

The majority isolates and considers the sufficiency of each of the factors in the record individually, and attributes little or virtually no weight to any factor. This is error under *Arvizu*. I therefore respectfully dissent.